1
2
3
4
5
6
7
8
9

10 **UNITED STATES DISTRICT COURT**

11 EASTERN DISTRICT OF CALIFORNIA

12 —o0o—

13

14

| | | |
|---|---|---|
| 15 ARMANDO ORTIZ, | ) | 1:03-CV-06303 LJO JMD (HC) |
| | ) | |
| 15 Petitioner, | ) | FINDINGS AND RECOMMENDATION |
| 16 | ) | REGARDING PETITION FOR WRIT OF |
| 16 v. | ) | HABEAS CORPUS |
| 17 | ) | |
| | ) | |
| 18 A.A. LAMARQUE, Warden, | ) | [Doc #1] |
| | ) | |
| 19 Respondent. | ) | |
| | ) | |

20

21     Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

22 pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C.

23 § 636(b)(1) and Local Rule 72-302.

24 PROCEDURAL HISTORY

25     Petitioner is confined by the State of California, pursuant to a judgment of the Superior

26 Court of California, County of Fresno. On September 25, 2000, a jury convicted Petitioner of:

27

28

1  first degree murder (Cal. Pen. Code §187[1]); and  second degree robbery (§211).  On November

2  30, 2000, the trial court sentenced Petitioner to a term of 25 years to life plus five years.

3        On July 26, 2001, Petitioner filed his Opening Brief on Appeal.  On January 09, 2003, the

4  California Court of Appeals, Fifth Appellate District (hereinafter "Fifth DCA") affirmed

5  Petitioner's conviction.

6        On February 6, 2003, Petitioner filed a petition for review before the California Supreme

7  Court.  On March 19, 2003 the California Supreme Court denied review.

8        On December 1, 2003, Petitioner filed his Amended Petition for Writ of Habeas Corpus

9  in this Court.  Respondent filed an Answer to the Petition on August 18, 2005, and Petitioner

10  filed a traverse to Respondent's Answer on September 08, 2005.

11            **FACTUAL BACKGROUND**

12  The Court adopts the facts as recited by the Fifth DCA in its opinion dated January 09, 2003:

13        At approximately 1:30 a.m. on December 19, 1999, Josie Zapata, Laura
14  Puentes and Javier Perdomo exited a taxicab near an apartment complex located
    in a high crime area of south Fresno.  Just as they began walking toward the
15  apartment they shared in the complex, Perdomo was hit on the head and knocked
    unconscious.  Zapata heard Puentes scream and then she heard three gunshots.
16  She turned around and saw four young, thin men dressed in black.  One of the
    men was holding a long handgun.  He looked Hispanic, in his 20s, and he had a
17  thin moustache.  He was about five feet four inches or five feet five inches tall.
    He was wearing an oversized, long black jacket, black baggy pants and a black,
18  close-fitting knit cap.  She could not tell the race of the other three men.  One of
    the four men hit Puentes on the head and she fell to the ground.  Zapata started to
19  run.  The man holding the gun pursued her and hit her on the back of the head,
    knocking her unconscious.  One of the four men took Perdomo's wallet and the
20  cash he had in his pants pocket before they fled the scene.  Perdomo's wallet
    contained his payroll check and a social security card belonging to Perdomo's
    brother, Victor.

21

22        James Webb lived across the street.  He was awakened by loud voices and
    the sound of gunshots.  He looked out his bedroom window and saw one man run
23  out from the apartment complex.  A second man holding a gun came out of the
    complex and fired two shots at the first man who fell to the ground.  The second
24  man with the gun turned and went back into the apartment complex.  Then he saw
    two Hispanic males run to another apartment complex south of his house.
25  Webb's wife, Yolanda, saw a person dressed in black, heard three gunshots, and
    then saw two boys wearing dark clothing run into the apartment complex south of
    their house.

26

27        Perdomo soon recovered consciousness.  He saw a man, later identified as

28      [1]  All subsequent statutory references are to the California Penal Code unless otherwise noted.

Jose Rafael Navarro, laying on the ground nearby. Navarro had suffered a gunshot wound to the abdomen. Perdomo tried to assist Navarro, but Navarro was unresponsive and he died a few minutes later.

Officers arrived at approximately 1:45 a.m. An expended .44-caliber shell casing was found on the sidewalk in front of the crime scene and three more expended .44-caliber shell casings were found just north of the sidewalk area. Some shoe tracks found near the shell casings were photographed.

A few minutes after 2:00 a.m., Kieng Youdoune was awakened by the sound of a gunshot. She lived one block east of the apartment complex where the robbery and homicide occurred. Youdoune discovered that the kitchen window of her home had been shattered by a gunshot. She found a .44-caliber bullet on the kitchen floor. She checked on her parents and then looked out the dining room window. She saw the defendants sitting on her front porch. She telephoned the police.

Fresno Police Officer Anthony Bettencourt investigated the gunshot at the Youdoune residence. He noticed that there was a hole in the stucco on the upstairs wall of a two-story apartment building located on San Pablo Avenue directly north of the Youdoune residence. Officer Bettencourt was walking toward the entry of this apartment building at approximately 3:20 a.m. when he saw the defendants standing about 15 feet away from the bottom of the stairway leading to the two upstairs apartments of this building (apartments 201 and 202). Neither defendant was wearing a jacket, which was inappropriate for the cool weather (36 degrees Fahrenheit). Walker was wearing a black shirt and jeans; Petitioner was wearing a white T-shirt and jeans. Officer Bettencourt heard Walker say to Petitioner, "Let's get out of here. Too many cops tonight." He detained the defendants and placed each of them alone in the rear seat of a patrol car. He walked upstairs to apartment 201 and knocked on the door. When no one answered, he forced entry. While checking for injured persons, he noticed a wallet and some identification documents in the bathroom. There was a bullet hole in the south wall of the kitchen that corresponded to the hole on the outside of the building. While Officer Bettencourt was inside the apartment, Walker kicked out the rear window of the patrol car.

Genaro Garcia lived in apartment 202. Investigating Detective Michael Garcia testified that Genaro told him that defendants had lived n apartment 201 for at least a month. He had last seen defendants together drinking vodka during the evening of December 18 or the early morning hours of December 19. Youdoune testified that she occasionally saw the defendants around the upstairs apartments of this building. Petitioner's brother, Tony Garcia, told authorities that Petitioner lived in an upstairs apartment of a building that was on the west side of San Pablo Avenue. His description of the apartment's furnishings was consistent with the contents of apartment 201.

Investigating officers obtained a warrant and searched apartment 201. A black Pacific Trail brand jacket, size extra large, a black pair of fingerless gloves, a scarf, and a navy cap were found. When an officer picked the jacket up off the couch, a spent .44-caliber shell casing fell out of it. Another .44-caliber expended cartridge casing was found laying on the floor. Officers found Perdomo's wallet in the bathroom. A payroll check payable to Javier Delgado Perdomo, a social security card in the name of Victor Delgado and a $1,00 peso bill were all floating in the toilet. A .44-caliber Desert Eagle brand semi-automatic pistol (the handgun) was found inside an air vent.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

On January 31, 2000, Petitioner's mother gave authorities a letter that Petitioner had written to Detective Wells. The letter as redacted to remove references to Walker and admitted at trial. Petitioner wrote that "Only God can judge [him]," that, "I asked him to forgive me. I prayed for the person and hope he is with God," and that he cared "about that person because I am not an evil person."

Criminalist Stephen O'Clair testified that the four bullet casings found at the murder scene and the bullet casing that was found on the floor of apartment 201 had all been fired by the handgun. O'Clair compared the shoes defendants were wearing when they were detained with the shoe prints found at the murder scene. One of the shoe prints found at the crime scene was consistent in design and size with Walker's Nike brand shoes. Another of the shoe prints was consistent in design and size with Petitioner's K-Swiss brand shoes. One of Petitioner's shoes had a human bloodstain on it.

Neither defendant testified. The defense did not call any witnesses.

## DISCUSSION

### I. Jurisdiction

_____Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### II. Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

ed

1    custody pursuant to the judgment of a state court only on the ground that he is in custody in

2    violation of the Constitution or laws or treaties of the United States." 28 U.S.C . § 2254(a).

3        The instant petition is reviewed under the provisions of the AEDPA. Lockyer v.

4    Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, a petition for habeas corpus will not be

5    granted unless the adjudication in question "resulted in a decision that was contrary to, or

6    involved an unreasonable application of, clearly established Federal law, as determined by the

7    Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable

8    determination of the facts in light of the evidence presented in the State Court proceeding." 28

9    U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

10        As a threshold matter, this Court must "first decide what constitutes 'clearly established

11    Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at

12    71, quoting 28 U.S.C. § 2254(d)(1). In ascertaining "clearly established Federal law," the Court

13    looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the

14    relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly

15    established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth

16    by the Supreme Court at the time the state court renders its decision." Id.

17        Finally, this Court must consider whether the state court's decision was "contrary to, or

18    involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

19    72, quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

20    grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

21    Court on a question of law or if the state court decides a case differently than [the] Court has on a

22    set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

23    at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

24    state court identifies the correct governing legal principle from [the] Court's decisions but

25    unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

26    413.

27        This Court may not issue the writ simply because in its independent judgment the state

28    court decision applied clearly established federal law erroneously or incorrectly; for a writ to

1  issue, 'that application must also be unreasonable." Id. at 411.  A federal habeas court making

2  the "unreasonable application" inquiry should ask whether the state court's application of clearly

3  established federal law was 'objectively unreasonable." Id. at 409.

4        Petitioner has the burden of establishing that the decision of the state court is contrary to

5  or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

6  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

7  states, ninth circuit precedent remains relevant persuasive authority in determining whether a

8  state court decision is objectively unreasonable.  See Duhaime v. DuCharme, 200 F.3d 597, 600-

9  01 (9th cir. 1999).

10       AEDPA requires that this court give considerable deference to state court decisions.  The

11 state court's factual findings are presumed correct.  28 U.S.C. § 2254(e)(1).  Moreover, we are

12 bound by a state's interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.

13 2002), cert. denied, 537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

14 III.  **Review of Petitioner's Claims**

15     A.    **Claim One:   Admission of Codefendant's Out of Court Statements in**
                      **Violation of the Sixth Amendment**

16       In his first claim, Petitioner asserts the trial court erred when it admitted co-defendant

17 Walker's out of court statement.  Petitioner argues the admission of this statement violated his

18 Sixth Amendment right to confrontation and cross-examination.

19                   **1.    Factual Background**

20       Codefendant Walker waived his right to remain silent and the detectives interviewed him
21 on December 19 and December 20.  Walker said that Petitioner and a man named "Joe"
   committed the robbery and homicide.  Walker described Joe as a Mexican man about 30 years of
22 age, five foot six or five foot seven inches tall with a "medium skinny build" and "a messed-up
   finger."  Walker told the detectives that he was at his girlfriend's house when Joe approached
23 him and borrowed his black jacket.  Joe and Petitioner left.  They returned about three hours
   later.  Joe handed Walker a large handgun.  Walker touched it and gave it back to Joe.  Walker
24 told Joe to keep the jacket and to leave.  He went to an apartment on San Pablo Avenue to visit a
   friend known as "Bullet."  As he was leaving, he encountered a police officer.  During his first
25 interview Walker said that he would "[t]ell anything to anyone" to get out of the situation.

26       On December 23, Walker contacted Detective Wells and said that he wanted to talk with
   him.  Detective Wells met with Walker that afternoon.  Walker stated that while he was in court
27 at his arraignment on December 22, Petitioner "asked him if he was gonna tell on him" Petitioner
   said that he had already told the police that Walker was involved in the crimes.  Petitioner also
28 "told him [Walker] that they had gotten a thousand dollar bill."  Walker then repeated the "whole
   scenario about [Joe] borrowing his jacket and trying to come back and trying to give him the

ed

jacket back and he wouldn't take it...." Walker continued to deny any involvement in the murder or robbery throughout the interview.

Defense counsel moved to exclude Walker's three out-of-court statements, arguing that they were unfairly prejudicial and had been taken in violation of his constitutional rights. These arguments were rejected. Counsel then argued that the statements were inadmissible hearsay and that references to Petitioner must be redacted to avoid *Aranda-Bruton* error. The court's rulings on the admissibility of Walker's December 19 and December 20 statements were not recorded in the record. However, Detective Wells subsequently testified about the contents of Walker's December 19 and December 20 statements without referring to Petitioner. Accordingly, we conclude that the court overruled the hearsay objection but found that *Aranda-Bruton* argument persuasive. The court's ruling on the admissiblity of Walker's December 23 statement was placed on the record. The court rejected defendant's challenges to this evidence, reasoning: "[T]he appropriate test in this case is not a firmly rooted exception. I don't know if a hearsay admission exception to the hearsay rule admission qualifies or not, but the Court feels that in this case we're concerned about the guarantees of trustworthiness of the [sic] Defendant Walker's December 23rd statement." The court concluded that the requisite guarantees of trustworthiness had been established to its satisfaction. The jury was given a limiting instruction before Detective Wells testified about his December 23 conversation with Walker during which Walker relayed comments Petitioner made to him as set forth.

## 2. Clearly Settled Supreme Court Law

### a. The Confrontation Clause

On March 8, 2004, in Crawford v. Washington, the United States Supreme Court overruled Ohio v. Roberts and held that the Confrontation Clause bars the admission of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him, regardless of the reliability of such statements.

However, under the AEDPA, the relevant inquiry is whether a state adjudication was contrary to Supreme Court authority as it existed "at the time the state court rendered its decision." Lockyer v. Andrade, 538 U.S. 64, 71. At the relevant time, the controlling Supreme Court authority was Ohio v. Roberts, 448 U.S. 56.[2] Under Roberts, hearsay statements offered as evidence against a defendant are admissible under the Confrontation Clause if the declarant is unavailable and the statement bears adequate "indicia of reliability." Indicia of reliability can be found where the evidence falls within a firmly rooted hearsay exception or where it contains

[2] Petitioner and Respondent both note that in Bockting v. Bayer, 399 F.3d 1010, 1012-13 (9th Cir. 2005), the Ninth Circuit Court of Appeals held the Crawford rule to have retroactive effect. However, the Supreme Court in Whorton v. Bockting overruled the Ninth Circuit and held that Crawford did not apply retroactively. Accordingly, the controlling authority for purposes of the present Petition is Ohio v. Roberts.

1  particular guarantees of trustworthiness.  Id. at 65-70; Idaho v. Wright, 497 U.S. 805, 814-15

2  (1990).

3  **b.    Aranda-Bruton**

4  The *Aranda-Bruton* rule has its origins in People v. Aranda, 63 Cal.2d 518 (1965) and

5  Bruton v. United States, 391 U.S. 123 (1968).  In Aranda, the court addressed concerns over

6  admitting a codefendant's extrajudicial statement at a joint trial, where the statement implicates a

7  nondeclarant codefendant.  The court recognized that the practice of requiring severance where

8  the confession of one defendant implicates another defendant was not constitutionally compelled,

9  since the Supreme Court in Delli Paoli v. United States, 352 U.S. 232, 243 (1957) held that joint

10  trials were permissible even though the prosecution intends to introduce a confession from one

11  defendant which incriminates another defendant, so long as an instruction was given limiting the

12  effect of the confession to the declarant defendant.  The Aranda court nonetheless declared as a

13  judicial rule of practice that it is error for the prosecution to introduce a codefendant's

14  extrajudicial statement if said statement implicates another defendant.  If the prosecution desires

15  to use the statement, severance is required unless references to the nondecalarant defendant can

16  be effectively redacted.

17  In Bruton, the Supreme Court overruled Delli Paoli and held that a defendant is denied

18  his constitutional right of confrontation when an extrajudicial statement of a codefendant

19  implicating the defendant is admitted into evidence and the declarant codefendant does not take

20  the stand, notwithstanding any limiting instructions to the jury.  Bruton, 391 U.S. at 135-136.  By

21  not taking the stand, the codefendant is not subject to cross-examination, thus depriving the

22  defendant of his confrontation right.  Id.

23  The *Aranda-Bruton* rule rests on the belief that a limiting instruction cannot prevent the

24  jury from considering a codefendant's statement against a nondeclarant defendant.  Richardson v.

25  Marsh, 481 U.S. 200, 206-207 (1987).  As such, it represent a narrow exception to the general

26  rule that jurors are presumed to follow their instructions.  Id.

27  In Richardson, 481 U.S. 200 (1987), the Supreme Court addressed a situation where a

28  codefendant's statement was redacted to omit any reference to the nondeclarant defendant, but

ed                                                8

1    the nondeclarant defendant was nonetheless linked to codefendant's confession by other properly

2    admitted evidence.  The <u>Richardson</u> Court rejected the "contextual implication" doctrine

3    (developed by the Circuit Courts following <u>Bruton</u>) which required courts to assess whether, in

4    light of all the evidence, a codefendant's confession was so powerfully incriminating that a new,

5    separate trial was required.  Rather, "[i]t held that the [*Bruton*] rule is limited to facially

6    incriminating confessions."  <u>United States v. Sherlock</u>, 962 F.2d 1349, 1361 (9th Cir. 1989), cert.

7    Den., *sub nom.* <u>Charley v. United States</u>, 113 S.Ct. 419 (1992).  Thus, "only those statements that

8    'clearly inculpate' the defendant or are 'powerfully incriminating' implicate the *Bruton* rule."

9    <u>United States v. Yarbrough</u>, 852 F.2d 1522, 1537 (9th Cir. 1988), cert. Den., 488 U.S. 866.

10                           **3.      Review by the State Courts**

11           Petitioner's claim was first presented to the Fifth DCA on direct appeal.  The Fifth DCA

12   rejected Petitioner's claim.  The Fifth DCA noted the applicable constitutional law regarding the

13   introduction of extrajudicial statements made by a nontestifying codefendant at a joint trial.  Ex.

14   3,  n.5, citing U.S. Const. Amend VI; <u>U.S. v. Sherlock</u>, 962 F.2 1349, 1361 (9th Cir. 1989); <u>U.S.</u>

15   <u>v. Yarbrough</u>, 852 F.2d 1522, 1537 (9th Cir. 1988).  The court went on to find that <u>Aranda-Bruton</u>

16   was not implicated because it was clear from the context of the statement that codefendant

17   Walker was not saying Petitioner had handed him a gun, but that another individual named 'Joe'

18   had done so.

19                           **4.      Analysis of Petitioner's Claim**

20           The determination of the Fifth DCA is not contrary to, nor an unreasonable application of

21   Supreme Court precedent.  As noted by the Fifth DCA, the prohibition against the introduction of

22   extrajudicial statements made by a nontestifying codefendant is limited to facially incriminating

23   statements clearly inculpating the nondeclarant defendant.  <u>U.S. v. Sherlock</u>, 962 F.2d 1349,

24   1361 (9th Cir. 1989); <u>U.S. v. Yarbrough</u>, 852 F.2d 1522, 1537 (9th Cir. 1988).  The statement in

25   question did not clearly implicate Petitioner.  Rather, read in context the statement clearly

26   references another individual named 'Joe' as the person who handed Walker a gun.  Detective

27   Wells stated on two occasions that Walker told him Joe handed him the gun.  Detective Wells

28   testified that Walker said he returned the gun to Joe, told Joe he didn't want anything to do with

the gun or jacket, and warned Joe "Don't bring it into my girlfriend's house."  It is clear that this statement did not implicate Petitioner, and therefore does not raise confrontation clause issues. Accordingly, Petitioner's claim should be denied.

### B.    Claim Two: Admission of Codefendant's December 23 Statement

In his second claim for relief, Petitioner argues the admission of codefendant Walker's December 23 statement to Detective Wells denied him due process.  The facts and settled law regarding this claim are set forth in Section III(A)(1) and (2), *supra*.

### 1.    Clearly Settled Supreme Court Law

In addition to the applicable law set forth above, We note the following precedent regarding constitutional error at trial:

Constitutional error at trial does not automatically necessitate reversal of criminal convictions.  Chapman v. California, 386 U.S. 18 (1967).  An otherwise valid conviction should not be set aside if the constitutional error is found to be harmless.  Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

On direct review, trial error is analyzed under the standard articulated in Chapman v. California, 386 U.S. 18 (1967).  In Chapman analysis, a constitutional error is harmless if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  For purposes of habeas corpus review, however, a different standard exists.  *See* Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (articulating the difference between harmless-error review on direct and collateral appeal).  At the habeas level constitutional error results in reversal "only if it 'had a substantial and injurious effect or influence in determining the...verdict."  Brecht, 507 U.S. at 631, *quoting* Kotteakos v. United States, 328 U.S. at 776. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to relief based on trial error unless they can establish that it resulted in "actual prejudice."  Id. at 637, *citing* United States v. Lane, 474 U.S. 438, 449 (1986).

.    ### 2.    State Court Review

Petitioner's claim was first presented on direct appeal to the Fifth DCA, which rejected said claim.  The Fifth DCA found Petitioner's challenge to the admission of this evidence to be

1   "more substantial." Ex. 3 at 8.  It found the testimony to be multiple hearsay for which no

2   applicable hearsay exceptions existed.  Further, the Fifth DCA found that references to Petitioner

3   in Walker's statement should have been redacted.

4           The court found that since both Petitioner and codefendant had invoked their Fifth

5   Amendment rights, they were for hearsay purposes not available as witnesses.  Detective Wells'

6   testimony recounting Walker's December 23 out-of-court statement conveying comments made

7   by Petitioner was admitted for its truth, and was therefore multiple hearsay.  Petitioner's

8   statement to Walker on December 22 is the first layer of hearsay; Walker's statement to

9   Detective Wells the following day is the second.  Petitioner's statement to Walker falls within the

10  party admission exception; however there is no exception for the second level of hearsay.[3]

11  Accordingly, the Fifth DCA found the hearsay objection should have been sustained.

12          The Fifth DCA also rejected the trial court's assessment of the inherent trustworthiness of

13  codefendant Walker's December 23 statement.  The court noted that Walker had a "strong

14  motive to fabricate self-serving and unreliable information."  Ex. 3 at 11.  The court noted that

15  Walker's statements to Detective Wells appeared to be part of an effort to negotiate a plea

16  agreement.

17          Having found that the admission of the statement was improper under state evidentiary

18  law, the Fifth DCA went on to assess whether admission of the testimony also infringed

19  Petitioner's confrontation right.  The court found that the requisite "indicia of reliability" are

20  lacking where a declaration is made to authorities after the declarant has been arrested and

21  charged with a serious offense; especially where the statement is exculpatory in the sense that the

22  declarant blames a coparticipant for the commission of the offense.  Ex. 3 at 12.  Having already

23  determined that Walker's December 23 statement was not inherently trustworthy, the Fifth DCA

24  went on to conclude the necessary guarantees of trustworthiness were lacking.  Therefore, it

25  found the admission of this statement to be constitutional error.  It likewise found *Aranda-Bruton*

26

27          [3]  The Fifth DCA rejected Respondent's claim that the statement was a declaration against penal interest,
    because Walker's comments about Petitioner were not disserving to Walker's penal interests, particularly in view of
28  Walker's continued denial of all culpability for the robbery and murder.

1  confrontation clause error arising from the trial court's failure to redact the patently inculpatory

2  remarks Walker attributed to Petitioner (e.g. "Are you going to tell on me?").

3          The Fifth DCA went on to assess whether this error had resulted in prejudice to

4  Petitioner.  It noted that the remarks attributed to Petitioner were adverse to his penal interests.

5  Asking whether Walker was going to "tell on" him demonstrated guilty knowledge, and the

6  statement regarding the $1,000 bill connected him to the thousand peso bill found floating in the

7  toilet of apartment 201.  However, the Fifth DCA found that when weighed against the other

8  evidence proving Petitioner's guilt, "the remaining evidence was sufficiently compelling that the

9  erroneously admitted remarks did not influence the jury's verdict."  Ex. 3 at 13.  The Fifth DCA

10 noted that Petitioner closely fits Zapata's description of the robber with the gun.  One of

11 Petitioner's shoes had a drop of blood on it and the shoe was consistent in size and shape with

12 one of the shoe prints found at the crime scene.  Petitioner was observed by Youdoune sitting on

13 her front porch a block from the crime scene soon after the shooting.  The murder weapon was

14 hidden in an air vent in an apartment linked to Petitioner.  Inside this apartment, officers also

15 found victim Palermo's wallet and its contents, as well as dark outer clothing and an expended

16 shell casing matching expended shell casings found at the crime scene.  When Petitioner heard

17 Detective Garcia tell his mother that he was in a lot of trouble, he did not protest his innocence,

18 gut rather said he was going to have to serve a lot of time.  Later, he wrote a letter to an

19 investigating officer asking for forgiveness and saying he was praying for 'the person.'  In light

20 of the strength of this evidence, the Fifth DCA found it "abundantly clear the erroneously

21 admitted testimony did not affect the verdict."  Ex. 3 at 14.

22                     **2.        Analysis of Petitioner's Claim**

23         We agree with the Fifth DCA's assessment that the admission of Walker's December 23

24 comments to Detective Wells, particularly without redacting any reference to Petitioner, was

25 constitutional error.  However, as noted above, constitutional error does not automatically require

26 reversal.  Chapman v. California, 386 U.S. 18 (1967).  For purposes of habeas review, Petitioner

27 is entitled to a reversal of his conviction only if the erroneous admission of this testimony "had a

28 substantial and injurious effect or influence in determining...the verdict."  Brecht, 507 U.S. at

631, *quoting* Kotteakos v. United States, 328 U.S. at 776.  As the Fifth DCA notes, there was

substantial evidence of Petitioner's guilt aside from the erroneously admitted testimony.

Petitioner closely matches the description given by one witness of the robber with the gun.  One

of Petitioner's shoes had a drop of blood on it, and the shoes matched the size and shape of one

of the shoe prints found at the scene of the crime.  Petitioner was seen sitting on witness

Youdoune's porch close to the crime scene shortly after the shooting.  The murder weapon was

hidden in Petitioner's apartment, and a shell casing matching the shell casings found at the crime

scene was likewise found in the apartment, as was one victim's wallet and its contents as well as

dark outer clothing matching the description given by the victim of the robbers' clothing.

Moreover, when Detective Garcia told Petitioner's mother that Petitioner was in a lot of trouble,

Petitioner did not deny this accusation, but instead told his mother he was going to have to do "a

lot of time."  Finally, Petitioner wrote a letter to an investigation officer in which he asked for

forgiveness and indicated that he was praying for "the person."  Given the strength of the other

evidence linking Petitioner to the crimes, we conclude that Petitioner has not demonstrated

"actual prejudice" requiring reversal of his conviction.  Brecht, 507 U.S. at 637, *citing* United

States v. Lane, 474 U.S. 438, 449 (1986).  Accordingly, Petitioner's claim should be denied.

## C.     Claim Three: Insufficient Evidence

In his third claim, Petitioner argues there was insufficient evidence to support his

conviction and that his conviction therefore violated his due process rights

### 1.     Clearly Settled Supreme Court Law

In reviewing sufficiency of evidence claims, California courts expressly follow the

Jackson standard articulated in Jackson v. Virginia, 443 U.S. 307 (1979).  *See* People v. Johnson,

26 Cal.3d 557, 575-578 (1980); *see also* People v. Thomas, 2 Cal.4th 489, 513 (1992).  Pursuant

to the Supreme Court's holding in Jackson, the test to determine whether a factual finding is

fairly supported by the record is as follows:

> "[W]hether, after reviewing the evidence in the light most favorable to the
> prosecution, any rational trier of fact could have found the essential elements of
> the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency of evidence claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324, n.16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

    **2.**    **State Court Review**

Petitioner first presented these claims before the Fifth DCA, which rejected said claims. Petitioner again presented the claims before the California Supreme Court, which denied review. In rejecting Petitioner's sufficiency of the evidence claim, the Fifth DCA articulated the standard of review as follows:

The standard of review is axiomatic. In reviewing a challenge to the sufficiency of evidence, the reviewing court assesses the entire record to determine whether there is substantial evidence supporting the jury's conclusion that the prosecution had sustained its burden of proof beyond a reasonable doubt. The reviewing court considers the evidence in the light most favorable to the judgment and presumes in its support the existence of every fact that could reasonably be deduced from the evidence. (*People v. Hayes* (1990) 52 Cal.3d 577, 631). When a challenge is asserted under the due process clauses of the federal and state Constitutions, the appellate court determines whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Rowland* (1992) 4 Cal.4th 238, 269).

The Fifth DCA went on to assess the evidence presented at Petitioner's trial. It first noted that the evidence supported a finding that the robbery and shooting were contemporaneous. Zapata testified that she heard shots being fired during the robbery, and multiple other witnesses reported hearing gunshots at that time. Ex. 3 at 14. The taxicab driver testified that after dropping off Zapata, Puentes and Palermo, he heard shots fired and saw a man fall to his knees.

1  Palermo found victim Navarro immediately after he regained consciousness.  No witnesses

2  reported hearing gunshots earlier in th evening nor was there any evidence that Navarro was shot

3  elsewhere prior to the robbery and then moved to the crime scene.  Id.

4          The Fifth DCA then assessed the evidence of Petitioner's involvement in the robbery and

5  shooting.  It found the evidence of Petitioner's guilt to be "compelling" and that of his

6  codefendant to be "more than adequate.".  Ex. 3 at 14-15.

7                     **3.     Analysis of Petitioner's Claim**

8          This Court finds the determination of the Fifth DCA is not contrary to, nor an

9  unreasonable application of the Jackson standard.  As noted by the state appellate court, there

10  was substantial evidence linking the shooting of Navarro to the robbery of Zapata, Puentes and

11  Palermo.  Multiple witnesses testified that they heard gunfire at the time of the robbery, and no

12  evidence was presented to the contrary.

13          With respect to Petitioner's involvement in the crimes, the evidence is more than

14  sufficient.  Petitioner closely matched witness Zapata's description of the robber with the gun.

15  One of Petitioner's K-Swiss shoes had a drop of blood on it and was consistent in size and shape

16  with one of the shoe prints found at the crime scene.  Petitioner was observed by witness

17  Youdoune sitting on her front porch a block from the crime scene shortly after the shooting.  The

18  murder weapon was hidden in an air vent in an apartment linked to Petitioner.  In the same

19  apartment, officers found victim Palermo's wallet and its contents, clothing matching the

20  description of the clothing worn by the robbers, and an expended shell casing matching other

21  casings found at the crime scene.

22          Additionally, Petitioner did not protest his innocence upon hearing Detective Garcia tell

23  Petitioner's mother that he was in a lot of trouble, Instead he told her he was going to have to

24  serve a lot of time.  He later wrote a letter to one of the investigating officers asking for

25  forgiveness and indicating he was praying for "the person."

26          In light of this evidence, the determination of the Fifth DCA is not contrary to nor an

27  unreasonable application of the Jackson standard, and Petitioner's claim should accordingly be

28  denied.

ed                                          15

1    **D.      Claim Four:  Instructional Error – CALJIC No. 2.15**

2          In his fourth claim for relief, Petitioner asserts the trail court erred in instructing the jury

3    pursuant to CALJIC No. 2.15.  Petitioner asserts the use of this instruction in a felony-murder

4    case raises an irrational inference of guilt in violation of his due process rights.

5                    **1.      Factual Background**

6          Over Petitioner's objections, the trial court instructed the jury as follows:

7          If you find that a Defendant was in conscious possession of recently stolen property, the
     fact of that possession is not by itself sufficient to permit an inference that the Defendant or
8    Defendants are guilty of the crime of robbery.  Before guilt may be inferred there must be
     corroborating evidence tending to prove Defendant's guilt.  However, this corroborating
9    evidence need only be slight and need not by itself be sufficient to warrant an inference of guilt.
          As corroboration you may consider the attributes of possession, time, place and manner
10   that the Defendant had an opportunity to commit the crime charged; the Defendant's conduct, his
     false or contradictory statements, if any, and other statements he may have made with reference
11   to the property; a false account of how he acquired possession of stolen property or any other
     evidence which tends to connect the Defendant with the crime charged.

12

13                   **2.      Clearly Settled Supreme Court Law**

14         Due Process requires the prosecution to prove every element charged in a criminal case

15   beyond a reasonable doubt.  In re Winship, 397 U.S. 358, 364 (1970).  A jury instruction that

16   "reduce[s] the level of proof necessary for the Government to carry its burden...is plainly

17   inconsistent with the constitutionally rooted presumption of innocence."  Cool v. United States,

18   409 U.S. 100, 104 (1972).

19         To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

20   the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

21   process.  Estelle v. McGuire, 502 U.S. 62, 72 (1991).  Additionally, the instruction may not be

22   judged in artificial isolation, but must be considered in the context of the instructions as a whole

23   and the trial record.  Id.  The court must evaluate jury instructions in the context of the overall

24   charge to the jury as a component of the entire trial process.  See, United States v. Frady, 456

25   U.S. 152, 169 (1982), citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  Furthermore, even

26   if it is determined that the instruction violated the petitioner's right to due process, a petitioner

27   can only obtain relief if the unconstitutional instruction had a substantial influence on the

28   conviction and thereby resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619,

1    637 (1993) (whether the error had a substantial and injurious effect or influence in determining

2    the jury's verdict.); see also Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

3         A permissive inference instruction allows, but does not require, the trier of fact to infer an

4    ultimate fact from proof by the prosecutor of other facts.  Ulster County, 442 U.S. at 157.  It does

5    not shift the burden of proof, and leaves the trier of fact free to credit or reject the inference.

6    Therefore, it does not disrupt Due Process unless, under the facts of the case, "there is no rational

7    way the trier could make the connection permitted by the inference."  Id.

8         Permissive inferences instructions are constitutional "so long as it can be said 'with

9    substantial assurance' that the inferred fact is 'more likely than not to flow from the proved fact

10   on which it is made to depend.'"  Schwendeman v. Wallenstein, 971 F.2d 313, 316 (9th Cir.

11   1992), quoting United States v. Rubio-Villareal, 967 F.2d 294, 296 (9th Cir. 1992) (en banc),

12   citing Ulster County, 442 U.S. at 166 n. 28.  In other words, a permissive inference violates Due

13   Process "only if the suggested conclusion is not one that reason and common sense justify in

14   light of the proven facts before the jury."  Francis v. Franklin, 471 U.S. 307, 314-15, citing Ulster

15   County, 442 U.S. at 157-63.

16                    **3.    State Court Review**

17        Petitioner's claim was first presented on direct appeal to the Fifth DCA, which denied the

18   claim.  The Fifth DCA first noted CALJIC No. 2.15 had withstood due process constitutional

19   attacks in previous cases where theft-related offenses were the predicate felonies for a felony-

20   murder charge.  Ex. 3 at 17, citing People v. Johnson, 6 Ca.45th 1, 37-39 (1993); People v.

21   Smithey, 20 Cal.4th 936, 975-978 (1999); People v. Holt, 15 Ca.4th 619, 677 (1997).  The court

22   noted that, rather than creating an improper presumption of guilt from the mere fact of possession

23   of stolen property, the challenged instruction does the opposite; it dictates that a finding of

24   robbery or burglary cannot be presumed from mere possession absent corroborating evidence.  Id.

25   at 18.  The Fifth DCA further found CALJIC No. 2.15 does not permit an inference of guilt based

26   on insufficient foundational facts nor does it reduce the required evidence below the reasonable

27   doubt threshold.  Id., citing People v. Holt, 15 Cal.4th at 677; Ulster County Court v. Allen, 442

28   U.S. 140, 167 (1979).

1    Turning to the evidence presented at trial, the Fifth DCA found sufficient evidence from

2    which a jury could find beyond a reasonable doubt that defendants constructively possessed the

3    stolen property.  Victim Palermo testified that his wallet was taken during the robbery and that it

4    contained his brother's Social Security card.  Palermo's wallet and the social security card were

5    found in apartment 201.  Evidence was presented demonstrating that Petitioner and Walker lived

6    in apartment 201 and were detained by Officer Bettencourt downstairs from the apartment shortly

7    after the crime.  The Fifth DCA found that this evidence was sufficient to warrant the use of

8    CALJIC No. 2.15.

9    Finally, the Fifth DCA found that, even were the use of the instruction error, any resulting

10   error was harmless.  Considering the jury charge in its entirety, the court noted the jurors were

11   instructed to disregard any instructions applying to a state of facts they determined did not exist,

12   and were told that none of the court's instructions should be construed as the court's opinion

13   about the facts.  The Fifth DCA found that these cautionary instructions rendered any error in the

14   use of CALJIC No. 2.15 harmless.

15   **4.    Analysis of Petitioner's Claim**

16   The decision of the Fifth DCA is not contrary to, nor an unreasonable application of

17   clearly settled Supreme Court law.  First, it should be noted that such instructions have withstood

18   constitutional scrutiny.  <u>See Barnes v. United States</u>, 412 U.S. 837 (1973).  As the <u>Barnes</u> Court

19   notes, an inference of guilt for robbery or theft based on the unexplained possession of stolen

20   goods is "a traditional common-law inference deeply rooted in our law."  <u>Id.</u>, 412 U.S. at 843.

21   Moreover, as the Fifth DCA notes, CALJIC No. 2.15 is a cautionary instruction, one which

22   benefits a criminal defendant by warning the jury not to infer guilt solely from the defendant's

23   conscious possession of stolen goods.  The instruction in this case is more restrictive than the

24   instruction approved in <u>Barnes</u> which permitted an inference of guilt based solely on the

25   unexplained possession of stolen goods.

26   Petitioner argues the use of the term "slight" in the instruction operated to impermissibly

27   lower the prosecution's burden of proof below the "beyond a  reasonable doubt" standard.  <u>See</u>

28   Traverse at 9-10.  However, as the Supreme Court in <u>Ulster County</u> notes, a permissive

ed                                    18

1   presumption affects the application of the reasonable doubt standard "only if, under the facts of

2   the case, there is no rational way the trier could make the connection permitted by the inference."

3   Ulster County, 442 U.S. at 157.  In the present case, there was ample evidence supporting the

4   jury's inference that Petitioner had committed the robbery.  Victim Palermo testified that his

5   wallet was taken during the robbery and that it contained his brother's social security card.  The

6   wallet and social security card were found in apartment 201.  Testimony at trial demonstrated

7   that Petitioner lived in apartment 201, and Petitioner and his codefendant were detained at the

8   bottom of the staircase leading to apartment 201 shortly after the crime.  A black jacket, pair of

9   fingerless black gloves, scarf and navy cap were found in the apartment.  A .44-caliber semi-

10  automatic pistol was found secreted in an air vent, and a spent .44-caliber shell casing was also

11  found in the apartment.  Criminalist O'Clair testified that the four bullet casings found at the

12  murder scene and the bullet casing found on the floor of apartment 201 were all fired from the

13  handgun found in the apartment.

14          Finally, on habeas review the challenged instruction is not viewed in isolation, but as part

15  of the overall jury charge.  In addition to CALJIC No. 2.15, the jury was instructed that: it was to

16  decide all questions of fact (CALJIC No. 1.00); circumstantial evidence is evidence from which

17  an inference may be drawn (CALJIC No. 2.00); an inference is a logical and reasonable

18  deduction from proven facts (CALJIC No. 2.00); where circumstantial evidence is equally

19  susceptible of two reasonable interpretations, the jury must adopt the interpretation supporting a

20  finding of innocence (CAL No. 2.00); and the defendant is presumed innocent and the

21  prosecution has the burden of proof beyond a reasonable doubt (CALJIC No. 2.90).  In light of

22  the evidence at trial and these instructions, CALJIC No. 2.15 did not impermissibly lower the

23  prosecution's burden of proof beyond a reasonable doubt, nor did it permit an irrational inference

24  of guilt.  Accordingly, Petitioner's claim should be denied.

25          **E.      Claim Five: Instructional Error – CALJIC No. 2.71.5**

26          In his fifth claim for relief, Petitioner asserts the trial court's use of CALJIC No. 2.71.5

27  violated his constitutional rights to remain silent and to be found guilty beyond a reasonable

28  doubt.

1          **1.      Factual Background**

2          At trial, evidence was presented that on December 19, Petitioner contacted Detective

3     Wells and asked to telephone his mother.  Detective Wells placed the call, identified himself and

4     told Petitioner's mother that Petitioner was "in a lot of trouble."  Wells handed Petitioner the

5     telephone.  Petitioner said he had "just called to let [her] know something," that "I'm going to

6     have to do a lot of time."  The trial court admitted this testimony as an adoptive admission.  At

7     the close of trial, the court instructed the jury on adoptive admissions as follows:

8                    If you find from the evidence that there was an occasion when Defendant,
            one, under conditions which reasonably afforded him an opportunity to reply, two,
9           failed to make a denial in the face of an accusation expressed directly to him or in
            his presence charging him with a crime for which the Defendant now is on trial, or
10          tending to connect him with its commission, and, three, that he heard the
            accusation and understood its nature, then the circumstance of his silence and
11          conduct on that occasion may be considered against him as indicating an
            admission that the accusation thus made was true.
12                   Evidence of an accusation statement is not received for the purpose of
            proving its truth but only as it supplies meaning to the silence and conduct of the
13          accused in the face of it.
                     Unless you find that a Defendant's silence and conduct at the time
14          indicated an admission that the accusatory statement was true, you must entirely
            disregard the statement.

15

16          **2.      State Court Review**

17          Petitioner's claim was first presented to the Fifth DCA, which denied it in a reasoned

18    opinion.  Petitioner argued the instruction should not have been given because it amounted to a

19    comment on his constitutional right to remain silent.  The Fifth DCA disagreed.  It first noted

20    that CALJIC No. 2.71.5 is a cautionary instruction warning the jury to disregard the evidence

21    presented unless they find a defendant's silence in the face of an accusatory statement indicative

22    of an admission that the accusation is true.  Because evidence of the telephone call to Petitioner's

23    mother was admitted as an adoptive admission, "it was imperative that the jury be instructed on

24    the foundational requirements for the use of the evidence."  Ex. 3 at 20.

25          The Fifth DCA went on to find no evidence that Petitioner was subject to police

26    interrogation or was invoking his right to remain silent at the time of the telephone call.

27    Detective Wells simply testified that Petitioner contacted him and asked to speak with his

28    mother.  The court noted that the Fifth Amendment privilege against self-incrimination does not

apply to commentary on a defendant's nonassertive conduct prior to trial, absent a showing such conduct was in assertion of the privilege to remain silent. Id. at 20-21, citing People v. Preston, 9 Ca.3d 308, 315 (1973).

### 3. Analysis of Petitioner's Claim

In this claim, Petitioner does not challenge the introduction of Detective Wells' statements regarding the telephone call with Petitioner's mother.  Rather, Petitioner challenges the trial court's use of CALJIC No. 2.71.5, which he asserts amounts to an impermissible comment on his right to remain silent.  However, as the Fifth DCA notes, CALJIC No. 2.71.5 is a cautionary instruction for the benefit of a criminal defendant against whom adoptive admission testimony has been proffered.  We find no authority for the proposition that such an instruction violates a criminal defendant's right to remain silent in the face of custodial interrogation.

Moreover, the record does not support a finding that Petitioner was subject to custodial interrogation at the time the telephone call was placed to his mother.  Officer Wells testified that he identified himself to Petitioner and told her that Petitioner was in a lot of trouble.  Rather than denying this statement, Petitioner informed her that he was "going to have to do a lot of time."

Neither the testimony itself nor the use of CALJIC No. 2.71.5 implicates Petitioner's Fifth Amendment right to remain silent.  Accordingly, Petitioner's claim should be denied.

### F. Claim Six: Instructional Error – failure to use CALJIC No. 1.24

In his sixth claim for relief, Petitioner asserts the trial court's failure to instruct the jury *sua sponte* on the term possession denied him due process.

### 1. Factual Background

CALJIC No. 1.24 defines "possession" as follows:

> There are two kinds of possession: actual possession and constructive possession.
> Actual possession requires that a person knowingly exercise direct physical control over a thing.
> Constructive possession does not require actual possession but does require that a person knowingly exercise control over or the right to control a thing, either directly or through another person or persons.
> One person may have possession alone, or two or more persons together may share actual or constructive possession.

### 2. Clearly Settled Supreme Court Law

ed

1       The <u>Estelle</u> standard for review of claims of error in the jury instruction is set forth above.

2  In cases where a petitioner challenges the *failure* to give an instruction, petitioner's burden is

3  "especially heavy" because "an omission, or an incomplete instruction is less likely to be

4  prejudicial than a misstatement of the law." <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977);

5  <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 625 (9th Cir. 1997).  An omission is evaluated by comparing

6  the omitted instruction to the given instructions.  <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 971 (9th

7  Cir. 2001), citing <u>Henderson v. Kibbe</u>, 431 U.S. at 156.

8       **3.    State Court Review**

9       Petitioner's claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA

10 rejected petitioner's claim in a reasoned decision.  The Fifth DCA found no error in that

11 Petitioner was not prejudiced by the omission of CALJIC No. 1.24.  Petitioner was not in actual

12 possession of stolen property when detained.  Thus, failure to instruct the jury that constructive

13 possession is also a form of conscious possession could not have materially assisted the defense.

14 The Fifth DCA found it was not reasonably probable that Petitioner would have received a more

15 favorable result if CALJIC No. 1.24 had been given.

16      **4.    Analysis of Petitioner's Claim**

17      We agree with the Fifth DCA that given the absence of evidence of actual possession,

18 there was no reason for the trial court to instruct the jury as to the difference between actual and

19 constructive possession.  Further, we agree with the Fifth DCA's finding that the exclusion of

20 CALJIC No. 1.24 did not prejudice Petitioner's defense.  The cases cited by Petitioner stand for

21 the proposition that in order to be convicted of possession of contraband, one must be shown to

22 exercise dominion and control over the contraband.  Traverse at 13, citing <u>United States v. Earl</u>,

23 27 F.3d 423 (9th Cir. 1994); <u>United States v. Savinovich</u>, 845 F.2d 834, 837 (9th Cir. 1988), cert.

24 Denied, 488 U.S. 443 (1988).  Neither case indicates that failure to define constructive

25 possession in the jury charge constitutes reversible error.  The decision of the Fifth DCA is not

26 contrary to, nor an unreasonable application of relevant precedent.  Accordingly, Petitioner's

27 claim should be denied.

28      **G.    Claim Seven: Inadequate Instructions Relating to Substitute Juror**

In his seventh claim for relief, Petitioner contends the trial court inadequately instructed the jury to begin deliberations anew upon replacing a juror for medical reasons.

### 1.    Factual Background

After the jury had deliberated for approximately three hours, the trial court received a note from a juror requesting to be replaced for medical reasons.  After investigating the request, the trial court replaced the juror with an alternate.  After the parties agreed, the alternate juror was sworn and the trial court instructed the jurors as follows:

> ...[L]et me instruct you that you must start your deliberations all over again because of the seating of the alternate.  That does not mean that you start talking about the – your deliberation just to bring prospective juror number 89 up to speed.  That is not the law.  The law is that you must start your deliberations all over right from scratch.  And that's extremely important.
> ...
> Do you have any questions at this time?
> Just let me emphasize that again that you must start your deliberations all over.  Okay?  Thank you.

### 2.    Clearly Settled Supreme Court Law

The standard for reviewing a challenged jury instruction is set forth above.

### 3.    State Court Review

Petitioners' claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA found that the jurors were "unequivocally directed in easily comprehensible and unambiguous language to set aside their earlier deliberations and to start over."  Ex, 3, 22-23.  Accordingly, it denied Petitioner's claim.

### 4.    Analysis of Petitioner's Claim

Petitioner's claim that the trial court's instructions failed to adequately convey the requirement to begin deliberations anew is without merit.   As noted by the Fifth DCA, the trial court in this case unequivocally directed the jurors to begin deliberations anew.  It explained that the existing jurors were not to bring the new juror "up to speed," but were to start over "right from scratch."  And it emphasized the importance of setting aside earlier deliberations numerous times.  The determination of the Fifth DCA is not contrary to, nor an unreasonable application of Supreme Court precedent.  Accordingly, Petitioner's claim should be denied.

1

**H.      Claim Eight: Failure to Give Accomplice Instruction**

2       In his eighth claim for relief, Petitioner alleges the trial court's refusal to instruct on

3   accomplice testimony prejudiced his defense and denied him due process.

4                          **1.      Factual Background**

5       During trial, the prosecutor moved to introduce statements made by codefendant Walker

6   to investigating police officers.  Codefendant Walker stated that after he and Petitioner were

7   arraigned, Petitioner asked Walker if he was "going to tell on him."  Walker also related that

8   Petitioner stated that he had advised the investigating officers that Walker was involved in the

9   shooting.  The prosecutor also moved to introduce a statement made by Walker that his

10  fingerprints might be on the murder weapon because an unnamed person handed it to him, but he

11  immediately gave it back.

12                       **2.      Clearly Settled Supreme Court Law**

13      The standard for reviewing challenges to jury instructions is set forth above.

14                          **3.      State Court Review**

15      Petitioner's claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA

16  found that the trial court had erred under state law by refusing to instruct on accomplice

17  testimony (CALJIC Nos. 3.10 to 3.13 and 3.18).  However, the Fifth DCA found that Petitioner

18  was not prejudiced by the omission.  The court noted that prior to Detective Wells' testimony on

19  the subject, the trial court instructed the jury that "[e]vidence of an oral admission of a Defendant

20  not made in court should be viewed with caution," and that the jury could consider the fact that

21  Petitioner could not call his codefendant as a witness "in determining how much weight, if any,

22  to give to [this statement]."  The Fifth DCA found that, while not as complete as the standard

23  pattern accomplice instructions, these instructions nonetheless did minimize the harm resulting

24  from the omission of the standard instructions.

25      In addition, the court noted failure to instruct on accomplice testimony is harmless error if

26  there is sufficient corroborating evidence in the record.  Such evidence need not corroborate

27  every statement of the accomplice, so long as it connects the defendant with the crime in such a

28  way as to satisfy the jury that the accomplice is truthful.  The Fifth DCA found adequate

ed                                          24

1  corroborating evidence connecting Petitioner to the crime.

2      The Fifth DCA summarily dismissed Petitioner's due process argument.

3      **4.    Analysis of Petitioner's Claim**

4      To the extent Petitioner's claim is based on state law, it is not cognizable in federal

5  habeas.  "As a state statutory rule, and to the extent that the uncorroborated testimony is not

6  'incredible or insubstantial on its face,' the rule is not required by the Constitution or federal

7  law."  Laboa v. Calderon, 224 F.3d 972 (9th Cir. 2000); *citing*  United States v. Necoechea, 986

8  F.2d 1273, 1282 (9th Cir. 1993) ("The uncorroborated testimony of an accomplice is enough to

9  sustain a conviction unless it is incredible or insubstantial on its face."); United States v. Lai, 944

10  F.2d 1434, 1440 (9th Cir. 1991); United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986);

11  Harrington v. Nix, 983 F.2d 872, 874 (8th Cir. 1993) ("[S]tate laws requiring corroboration do not

12  implicate constitutional concerns that can be addressed on habeas review.").

13      Habeas will only lie for Petitioner if the failure to provide accomplice instructions "so

14  infected the entire trial that the resulting conviction violates due process."  Estelle v. McGuire,

15  502 U.S. 62, 72-73 (1991).  We find that, viewing the record and the jury instructions as a whole,

16  the omission of accomplice instructions did not result in a denial of due process.  The trial

17  judge's comments to the jury prior to the testimony of Officer Wells minimized the prejudice

18  resulting from the failure to give the instruction, and, as noted *supra*, III(B)(2) and (3), Petitioner

19  was connected to the crime by other, properly admitted evidence.  Petitioner's claim should be

20  denied.

21      **I.    Claim Nine: Incorrect Application of the *Chapman* Standard**

22      In his final claim, Petitioner asserts the Fifth DCA incorrectly applied the *Chapman*

23  standard of review in assessing the harm resulting from the erroneous admission of codefendant

24  Walker's out-of-court statements to Detective Wells, thereby denying him due process.

25  Petitioner first raised his claim in his petition for review to the California Supreme Court.  The

26  California Supreme Court denied review.

27      **Analysis of Petitioner's Claim**

28      We find the Fifth DCA correctly applied the *Chapman* standard in assessing the effect of

the erroneous admission of Walker's December 23 conversation with Detective Wells.  <u>Chapman</u>

holds that constitutional error does not require reversal of a conviction if the error is harmless

beyond a reasonable doubt.  In reviewing Petitioner's claim, the Fifth DCA noted, "[w]e must

assess whether it is clear beyond a reasonable doubt that the erroneous admission of testimony

about Walker's December 23 conversation with Detective Wells did not influence the jury's

verdict."  Ex. 3 at 13, citation omitted.  Thus the Fifth DCA correctly articulated the *Chapman*

standard.  And, as we noted *supra*, III(B)(2), the Fifth DCA went on to assess the erroneously

admitted testimony in light of the rest of the evidence against Petitioner.  The Fifth DCA found,

and We agree, that in light of the substantial properly admitted evidence linking Petitioner to the

crime, the erroneous admission of codefendant Walker's out-of-court statements did not

influence the jury's verdict.  The Fifth DCA correctly articulated and applied the *Chapman*

standard; Petitioner's claim should therefore be denied.

## **RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas

corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Lawrence J.

Oliver, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636

(b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court,

Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after

service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the

specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951

F.2d 1153 (9th Cir. 1991).

1   IT IS SO ORDERED.

2   **Dated:    January 4, 2008**                                    **/s/ John M. Dixon**
                                                                UNITED STATES MAGISTRATE JUDGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ed